## ⸭ Miller *against* Jacobs.

A lien creditor can invoke no security taken by another which had not become a lien when he procured his own : hence a subsequent mortgagee, having taken bonds also, but without warrant to confess judgment, has not an equity to call on a prior mortgagee to enter up a judgment bond which accompanied his mortgage, in order to throw him on another fund ; nor can the subsequent mortgagee object to the vacation of judgments subsequently confessed on those bonds, though purposely withdrawn to make way for other judgment creditors, whose liens on the collateral fund are consequently posterior in date to his lien on the mortgage premises.

ERROR to the common pleas of *Perry* county.

This was an issue directed by the court of common pleas to try the right to money made by the sheriff out of the sale of S. Duncan and J. D. Mahon. William J. Miller was the plaintiff below and in error, and George W. Harris, administrator of R. T. Jacobs, defendant. The proceeds of the sale of Duncannon Forge, 11,500 dollars, was the subject of the controversy. The claimants were :—

George Metzger. Mortgage of Duncan & Mahon, dated the 7th of July 1828, to secure the payment of 2000 dollars, on the 7th of July 1832. Entered 8th of July 1828.

Anthony Stocker. Mortgage of Duncan & Mahon, dated the 12th of July 1828, to secure the payment of 4000 dollars, with interest from date, payable half yearly in Philadelphia. Entered 22d of July 1828. Under this the plaintiff claimed.

Alexander Henry. Mortgage of Duncan & Mahon, dated the 6th of July 1829, to secure the payment of 3874 dollars 40 cents, with interest, payable half yearly in Philadelphia. Entered 22d of September 1829.

Robert Clark. Mortgage of Duncan & Mahon, dated the 16th of April 1829, to secure the payment of two bonds of 3000 dollars each, first due the 1st of April 1832, the second due the 1st of April 1835; interest from the 1st of April 1829. Entered 9th of June 1830. This mortgage and the bonds secured by it were assigned by Clark to Jacobs, the defendant's intestate, on the 30th day of April, A. D. 1831, and the payment of them guarantied by indorsement thereon.

After these several mortgages were given in evidence, the plaintiff gave in evidence a deposition of J. D. Mahon, Esq. to these facts, " that he and S. Duncan were engaged as partners in the iron business at Duncannon Forge : that the money secured by the mortgages was borrowed from Stocker and from Henry through the agency of S. Duncan, for the use of the firm of Duncan & Mahon,

[Miller v. Jacobs.]

and was so applied : that the mortgages were the primary security for the payment of the money. When the mortgage was given to Robert Clark, he stipulated that it should not be entered on record for some time, so as that they might be able to borrow money in Philadelphia upon the security of an unincumbered estate."

No question arose about the right of George Metzger to have his money : the difficulty was as between Stocker, Henry & Jacobs, which was entitled.

Stocker had, besides his mortgage, a judgment bond, of the same date, for 4000 dollars, which he entered in Philadelphia on the 16th of August 1830.

Henry had also a judgment bond for his debt, which was never entered.

The judgment of Stocker, in Philadelphia, bound the real estate of Stephen Duncan in that county, which was previously subject to a mortgage of Duncan & B. Stiles, on Walnut street property, for 7000 dollars, with interest, to Daniel King : also to a mortgage of the same to Thomas Williams, on Front street property, for 4000 dollars and interest.

The interest which Stephen Duncan had in real estate in Philadelphia, was as tenant by the courtesy of the property hereinafter mentioned.

On the 28th of December 1832 the *following notice* was served on William J. Miller.

To Clements S. Miller, Esq. attorney of William J. Miller, trustee of Mrs Mary Miller, and representative of the late Anthony Stocker, mortgagee in a mortgage executed in his favour by Stephen Duncan and John D. Mahon, esquires, upon certain real estate situate in Perry county, Pennsylvania, upon which is erected a forge and probably other improvements.

Whereas the said Duncan & Mahon also executed a mortgage dated the 16th of April, A. D. 1829, on the same property to Robert Clark, for the security of two bonds of 3000 dollars each, with interest, which mortgage has been duly assigned, together with the bond to Richard T. Jacobs now deceased, and recorded in the said county of Perry on the 9th of June 1830, in the office for recording of deeds in deed book D., volume first, page 104, &c. ; but when executed not precisely known.

Understanding that the bond to secure which your mortgage was executed is a judgment bond, or a bond with authority to confess judgment.

Now, as the administrator of the estate of the said Richard T. Jacobs deceased, I hereby require you to enter your bond on record, and obtain judgment thereon, so as to bind the real estate of Stephen Duncan, situate in the city and county of Philadelphia, whether a life estate or in fee simple, or otherwise, and so that the same may be paid out of the proceeds of sale of the same, when sold ; otherwise I will object to your receiving payment of the same out of

[Miller v. Jacobs.]

the mortgaged property in Perry county. This notice is not to be considered as admitting priority of payment as to your mortgage over that of Richard T. Jacobs deceased, on the sale of the mortgaged property.

GEORGE W. HARRIS,
Administrator of the estate of Richard T. Jacobs deceased.

A similar notice was served on Alexander Henry by William Grimshaw, Esq. who testified on the subject as follows:

" In the month of December 1832 I received a letter from Washington Harris, Esq. of Harrisburg, containing a notice, which notice I served personally upon Alexander Henry, Esq. to whom the same is directed, on the 15th day of the same month. In reply to a question put by me to Mr Henry, whether or not he held a judgment bond of Stephen Duncan, as an accompaniment to the mortgage, he replied in the affirmative, and, to the best of my recollection, submitted it to my inspection. He at the same time stated to me that Mr Bayard, his attorney, was then absent at Washington, but was expected shortly to return; that he would willingly transfer the mortgage on Duncan's property to the administrator of the late Mr Jacobs on being paid the amount; that he did not like to enter up judgment on Duncan's bond in Philadelphia county, as requested in the above notice, without consulting Mr Bayard; but at the same time he offered the bond to me, with permission for me to enter it in said county if I chose.

" This offer I declined, saying to Mr Henry, to the best of my recollection, that it would not be professionally proper for me to act as attorney for two parties; nor would it be treating Mr Bayard with due courtesy, especially as he was so soon expected to return to the city.

" On Mr Bayard's return, which, I think, was in about a week afterwards, I waited upon him at his office in Walnut street, and renewed the request to enter up judgment, in conformity with the notice, stating to Mr Bayard that Mr Henry had offered to permit me to enter it, and my reasons for declining; and also citing to him some decisions in courts of equity, which had been transmitted to me by Mr Harris, to show that Mr Henry was in this case legally required to conform, and also repeating the representation which I had made to Mr Henry as to the sum in question being nearly equal in amount to the whole provision by the late Mr Jacobs for the support of his orphan children, and my opinion that if the requisition were not complied with, the administrator would contend with Mr Henry for the distribution thereof. Mr Bayard, however, peremptorily refused to enter up judgment on the said bond, saying that he did not consider that there was any law which rendered it imperative for him to do so, or words to that effect. I have no distinct recollection as to when this refusal was given. It may have been upon a second interview, after Mr Bayard had consulted in relation to the matter with Mr Henry."

[Miller v. Jacobs.]

At the date of these notices the liens against the estate of S. Duncan, in Philadelphia, and those obtained subsequently, will appear by the following account of the sale of the property and the appropriation of the money.

Benjamin Stiles agreed to join S. Duncan in a sale of the entire estate, and that Stephen Duncan should have one half of the proceeds of the sale, and in June 1833, they conveyed the

| | | |
|---|---:|---:|
| Walnut street property to Saving Fund for | $35,000 | 00 |
| Front street property to Turner for | 6,500 | 00 |
| Union street property to Malony for | 4,550 | 00 |
| | 46,050 | 00 |
| Deduct mortgage of Williams, | 4,200 | 17 |
| | 41,849 | 83 |
| Stephen Duncan's half, by agreement of B. Stiles, | 20,924 | 91 |
| B. Stiles paid S. Duncan for his interest in the Green Hill property, | 10,000 | 00 |
| | 30,924 | 91 |
| To which add this sum, furnished by B. Stiles, | 898 | 48 |
| | $31,823 | 39 |

Which sum was applied to the payment of the following debts:

| | | |
|---|---:|---:|
| Daniel King's mortgage paid in full, | $7,454 | 34 |
| Bank of North America *v.* Stephen Duncan. November 10th, 1830, judgment, | 10,016 | 74 |
| Alexander Calhoun *v.* Duncan and Mahon. October 6th, 1832, judgment, | 1,268 | 47 |
| David N. Mahon *v.* Stephen Duncan. July 27th, 1832, judgment, | 2,521 | 75 |
| Hugh Boyle *v.* Duncan and Mahon. November 22d, 1832, judgment, | 1,839 | 29 |
| Same *v.* Same. Same date, judgment, | 1,859 | 90 |
| Same *v.* Same. April 29th, 1833, judgment, | 1,783 | 35 |
| United States Bank *v.* Stephen Duncan. April 11th, 1833, judgment, | 1,187 | 76 |
| White and Harding *v.* Duncan and Mahon. May 8th, 1833, lien, | 354 | 96 |
| M'Credy and Parker *v.* Same. May 8th, 1833, lien, | 541 | 12 |
| Owen M'Gurgan *v.* Same. June 18th, 1833, two liens, | 1,506 | 42 |
| B. Wister and Co. *v.* Same. June 22d, 1833, lien, | 1,489 | 22 |
| | $31,823 | 39 |

[Miller v. Jacobs.]

In order to enable Stephen Duncan to make title to the purchasers, William J. Miller, the successor of Anthony Stocker, released the property sold from the lien of the judgment of Stocker in June 1833.

Deposition of T. Mitchell, and statement of facts taken by consent and given in evidence:

" Thomas Mitchell, a witness on the part of the plaintiff in the above cause, being duly affirmed, doth depose and say, that he is a conveyaucer and broker of real estate in the city of Philadelphia, and has been in that occupation for thirty-three years, and is well acquainted with the general value of real estate, and the rate at which it has sold there during that period. That he negotiated the sale of the different portions of real estate, in the city of Philadelphia, in which S. Duncan had a life interest and Benjamin Stiles the reversion, and which were sold respectively to the Savings Bank, Molony, and Turner, in fee by the said Duncan and Stiles; and also assisted in the arrangement by which the life interest in the estate in the county called Green Hill, held in the same manner, was purchased by the said Stiles. Deponent further says, that the only means by which the property so sold to Savings Fund, Molony, Turner and Stiles could have been disposed of at private sale, was the release executed by William J. Miller of the judgment held by him in trust for Mary Miller ; and that it could only have been otherwise sold at sheriff's sale, inasmuch as all the other lien creditors refused to release, and an execution, at the suit of Hugh Boyle, was pending in the circuit court of the United States, on all said Duncan's life estate in said property, and only prevented by the arrangement effected by said release. The deponent further says, that he is well convinced that the life interest in the city property would not have brought by any other mode 9000 dollars, and that in the Green Hill property 1000 dollars; and that said Stiles declined making this purchase, without he was enabled to make sale of the other property in the city."

Question by George W. Harris.

" What would the property near Frankford, in the county of Philadelphia, the property of Stephen Duncan, probably bring at public sale—or what is its value ?"

" This property, I think, would bring 15,000 dollars, perhaps something more or less. It had been sold to Doctor Duncan in September 1833 ; consideration 5000 dollars, subject to an old mortgage to Hannah Chancellor for 12,000 dollars."

B. Stiles, sworn. " S. Duncan owned other property in Philadelphia besides that sold to Savings Fund, Malony, and Turner, to wit, houses and lots. · He got 4000 dollars from me for his interest. All the estate he had in the city he got in right of his wife. I do not believe that the interest of S. Duncan in the city property could have been sold at sheriff's sale for a sum exceeding 8000 or 10,000 dollars. · The valuation, division, sale, and my agreement to allow Stephen Duncan the one half, was all one transaction; and if S. Duncan's

III.—3 L

judgment creditors had had claims beyond the amount of the sum which I allowed him for his interest, it could not have been sold. The amount I allowed him was greatly more than his creditors could have made out of it at sheriff's sale.   I should say more than double as much.   This remark I apply to all the property, both in the city and county.

" I should say the Green Hill property was worth 100,000 dollars, and growing more valuable every day.   I would hesitate about taking 150,000 dollars;   The property is unproductive and brings me in debt at the end of each year.   The taxes are very high, 700 dollars.   Rent 1000 dollars, all paid in taxes and repairs.   It did not produce a dollar to Stephen Duncan."

Upon these facts the court thus instructed the jury :

" Mr Metzger's mortgage is not embraced in the issue ; it is first in point of lien and is not disputed.   The next mortgage is from Duncan & Mahon to Anthony Stocker, trustee of Mary Miller.   It is dated the 12th of July 1828, and was recorded the 22d of July 1828.   This is for 4000 dollars.   In the first issue, the present plaintiff, W. J. Miller, who succeeded Anthony Stocker as trustee, claims this money under his mortgage.   Mr Harris, administrator of Richard T. Jacobs, controverts his right to the money ; and he claims it under a mortgage given by Duncan & Mahon for Robert Clark, the 16th of April 1829, and recorded the 9th of June 1830, and afterwards assigned to Jacobs.   If the case depended simply upon the two mortgages, the plaintiff W. J. Miller, who succeeded Anthony Stocker, would be entitled to recover ; there would be no grounds to dispute it, for his mortgage is prior in date, and first on record.   But the defendant alleges that the plaintiff has waived or forfeited his right to the money now claimed, so far as regards the defendant's claim ; or, in other words, that by the acts of William J. Miller he has postponed his right to the money, so as to let in the right under Clark's mortgage before him.  . The controversy consists partly of law and partly of facts ; we must settle the law and you the facts, and from the two combined you must make up your verdict.   As to the facts, it is contended that when Stocker took the mortgage under which the plaintiff claims, he took also a judgment bond ; the mortgage was entered in Perry county the 22d of July 1828, and judgment was entered upon his bond in Philadelphia on the 16th of August 1830. It is said these securities were for the same debt.   The mortgaged property was bound here by the mortgage, and the estate of S. Duncan in Philadelphia was bound by the judgment.   It is contended that in this way the plaintiff claiming under Stocker had a twofold security; the one here, under his mortgage, the other in Philadelphia, under his judgment.   Richard T. Jacobs, assignee of Clark, had resort only to the single fund here, covered by Stocker's mortgage. It is said, in this state of things all parties were perfectly safe : that the bonds in Philadelphia were amply sufficient to pay the judgment of Stocker, as well as any liens prior to it ; and in that way the land

[Miller v. Jacobs.]

here would be left to pay Clark's mortgage, and that it was sufficient for this purpose after the payment of any antecedent lien. This the defendants say is equity, and that the court and jury are bound to administer the law so as to effect this object, if it can be conveniently done. To effect this object, the defendant, Mr Harris, as administrator of Jacobs, on the 28th of December 1832, gave notice to the (now) plaintiff, Mr Miller, that he must resort to the lands in Philadelphia for the payment of his claims upon his judgment, and not to the mortgage in Perry county. After the service of the notice upon the plaintiff, instead of resorting to the lands in Philadelphia for the payment of his claim, or waiting the ordinary result, he actually released all lien and claim upon a large portion of Stephen Duncan's estate in Philadelphia, and did not proceed against others. Equity and equal justice are parts of the law of the land, and it is so that when one creditor holds two funds, and a subsequent creditor acquires a lien upon one of them, and not on the other, and there is enough to pay all, the proceeds of the funds must be so appropriated as to pay all: one creditor cannot discharge one fund and hold on to the other, and in this way defeat entirely the claim of the second creditor; the first creditor holding the two funds must resort to the one not held by the other, if the fund is equally accessible and enough for his purpose: I mean that he must do so on notice from the second creditor of his claim, and the circumstances constituting his equity. 'If the plaintiff in this case had a judgment in Philadelphia abundantly securing his whole claim by its lien upon sufficient estate, equally accessible to him as the lands in Perry county upon his mortgage, and, after receiving notice from the defendant, in its terms showing his claim and the equitable circumstances connected with it, if he did voluntarily release his lien in the city with design of throwing the whole burthen of his claim upon the lands in Perry, in such way as to defeat altogether the claim of the defendant, the loss would fall on the plaintiff, and not on the defendant. The law, tempered as it is with equity, in Pennsylvania, would not allow a creditor to wield his claim so as to throw the balance of the estate of the debtor into his own hands, under such circumstances, to the exclusion or injury of a subsequent lien creditor. This is the aspect in which the case may be presented on the part of the defendant, so far as it regards the claim of William J. Miller.' This view is controverted by the plaintiff. In point of fact, it is first alleged that the evidence does not show that Stocker released an accessible fund in Philadelphia competent to satisfy his claim. This must be decided by the jury. The private sales of S. Duncan's interest in Philadelphia, which were bound by the lien of the plaintiff's judgment, very far exceeded the amount of his claim, including any prior liens. The proceeds of such sales paid off liens against Duncan, and against Duncan & Mahon, to a sum exceeding 30,000 dollars, and still left upwards of 3000 dollars to be paid to Mr Duncan, the chief part of which liens were subsequent in date to the judg-

ment of Stocker. There was in addition to this a tract of land held by Mr D. in his own right, valued at 15,000 dollars, incumbered to the amount of 12,000 dollars, and which has been since sold at private sale for 17,000 dollars. But the witnesses say the property at forced sales would have produced a much less sum. Mr Stiles says not half the amount—perhaps not exceeding 8000 or 10,000 dollars. Mr Mitchell says the property sold would not have brought more than 10,000 dollars. It is doubtful if he included in his estimate the property sold to Mr Stiles by Mr Duncan, at 4000 dollars, and the money paid to himself. These estimates are but matters of opinion, and not so satisfactory as positive facts, where they can be had. The value of the property at a forced sale is the criterion, not what may have been gotten by compromise and private arrangement; though subsequent arrangement is evidence there was only a sum a little exceeding 7000 dollars a lien on Duncan's estate, before the lien of Stocker's judgment, and if he had proceeded upon the notice afterwards given, his claim would have taken grade as of the date of his judgment, and not of the date of the notice. There is a singular difference between the sum for which Duncan's interest actually sold and the estimated value. But it may be so—you must decide it. The whole testimony as to the value, its situation, rents, kind of property, location, and the duration of Duncan's interest, taxes, repairs, amount of private sales, and Duncan's age, &c., every thing should be considered in fixing the result. ' If the fund was ample and accessible, the plaintiff should have resorted to it.' If it was not, if it was embarrassed, if it required expenditure of money, damage of lawsuits, protracted controversies, and expenditure of money in pursuing such fund, the plaintiff would not have been bound to pursue it; and if the amount did not offer a prospect of getting the whole, he was not bound to pursue it for a part : a plaintiff by a single suit, process, expense, labour, is entitled to his whole claim, and cannot be compelled to seek for it in parts, in different counties and different courts, by different proceedings. The defendant rests upon an equity. This may be repelled by any equity. If doubt, difficulty, contention and expense lay in the way, the defendant should have taken these hazards and expenses upon himself by advancing the money to the plaintiff, or offering to do so, and demanding his security: he could not demand the plaintiff to undertake them ; having two securities, one good and another doubtful and expensive, the law will not interpose. But the subsequent creditor may assume the hazard and take the expense upon himself by advancing the money to the prior creditor and demanding his securities. If such were the facts in this case the defendant would not have a right to interpose his claim. ' We think further, if the plaintiff had an ample security unobstructed in the life estate, coupled with the separate estate of S. Duncan in the Frankford farm, that his release of the life estate would postpone his claim, though he did not release the Frankford estate. The question is, had the

[Miller v. Jacobs.]

plaintiff a clear indisputable fund in his reach, subject to his lien in Philadelphia, for the payment of his whole claim, and did he discharge that fund, or lessen it by his release, so as to render it ineffectual.' It is also contended by the defendant, that though the released fund might have been sufficient, yet the debt due plaintiff was from Duncan & Mahon, and that the estate in the city was the separate estate of Stephen Duncan, and that therefore it would have been inequitable for plaintiff to have proceeded against the separate estate of Duncan for the joint debt of Duncan and Mahon. 'Mahon it is said became insolvent about the year 1833; all the lands and estate of Duncan in Philadelphia were acquired by his wife, and have been sold, and the contest now about the distribution has shown the danger of loss to the parties, unless they succeed in this issue. If the controversy was in reference to Messrs Duncan & Mahon, or if they had estates exhibited here in testimony, and one or the other was likely to be prejudiced, this proposition might be of some weight. But partnership debts are essentially joint and several; and the private property of each partner is liable for the whole. Equity is but another name for justice: our law is made to yield to its dictates; it is moulded into shape and controlled by facts. Now if in fact this property was all required to pay the debts of the parties, and we know of no other in existence, the abstract nature of the debt being partnership, and the land held jointly, can have no avail. For Clark's mortgage was for a joint debt as well as that of Stocker, and whether one or other of the two be paid out of this fund, it would be in accordance with the original design.' But it is said the original design of the parties was, when Stocker's mortgage and bond were given, that the Perry county land was to be the primary fund. We do not think a private understanding of this kind, between the parties, would have any effect upon third persons. The liens of judgments, mortgages, &c. are legal incidents, and their effects and operations are regulated by law. Third persons have a right to look to the liens and the law, and to deal accordingly."

" It is not so that Calhoun, or any subsequent lien creditor in Philadelphia, could have claimed any right to substitution in prejudice of Mr Clark's mortgage, which was prior in date. Nor do we consider Stephen Duncan as standing in the light of a security. Nor do I think the equity of defendant is repelled by any thing in S. Duncan's being the purchaser of the Frankford farm: a recorded lien is notice to purchasers, and he always buys subject to its legal effect." As to Henry's case, we think there is but little difficulty in it. The principles above stated, so far as applicable, must be applied to this case. Henry had no judgment or lien in Philadelphia at the time of the notice served. Duncan's property in Philadelphia was greatly incumbered beyond what it was when Stocker entered his. Upon the service of the notice, he offered to receive the money from the defendant, and to give over to him his securities, and all the defendant could claim was to be put in his place. The plaintiff,

Henry, was not obliged to enter up a new judgment, to employ new counsel, to expend his money in procuring an additional lien, when he had one in Perry with which he was satisfied. If these facts are so, he is in no default, and is entitled to the money secured upon his mortgage.

"Exceptions were taken by the plaintiffs and by the defendants in the respective cases."

Error assigned.

The charge of the court to the jury is erroneous: the exceptionable parts are designated by inverted commas.

*Biddle* and *Watts*, for plaintiff in error. A prominent fact which characterizes this case is, that the judgment of Stocker was not obtained in Philadelphia for two months after the entry of Clark's mortgage. A lien creditor can invoke no security for his debt other than that which existed when he obtained his lien. He did not ask for the security which he now claims, but contracted for that only which he always had, and no part of which has been taken from him. The equity of a claimant must be that his fund has been taken away from him. An examination of the case, as a question of substitution, will exhibit the inapplicability of those rules of equity which permit substitution. Lien was a subject about which the parties contracted, and that contract was predicated upon the property pledged; and the influence of that contract cannot be extended by the act of one of the parties. A notice such as was given to the plaintiff, or such as can be effectually given by a lien creditor, is not creative, but preservative in its influence. Clark now asks to have his contract made better than he made it himself. Duncan's creditors in Philadelphia also contracted on the subject of lien, and predicated their contract upon all the circumstances which surrounded the subject. Duncan might well say to them, " the Stocker debt is secured in Perry county now when you take your lien." Suppose one of the Philadelphia creditors had given notice to Stocker to preserve his lien in Perry county, so that their security might be preserved for them, what was he to do? Does the law or any rule of equity distinguish between a first and second notice as creative of a right? 1 *Johns. Cha. Rep.* 412; Clows *v.* Dickerson, 5 *Johns. Cha. Rep.* 243; Nailer *v.* Stanley, 10 *Serg. & Rawle* 455; Sagitary *v.* Hyde, 1 *Vern.* 455; 2 *Peters's Con. En. Cha. Rep.* 358; 2 *Pow. on Mort.* 891; 2 *Fon. Eq. Appen.*; 1 *Chit. Eq. Dig.* 603; Drury *v.* Barnes, 3 *Russell* 94, support the principle that the right of substitution is to a claim which existed when the claimant's lien was obtained, and that a court of equity will not aid a lien creditor to obtain a security which his contract did not afford to him. But here the party asks to purchase a fund which belonged to a surety; for S. Duncan, as to his separate estate, is a surety of Duncan & Mahon. *Col. on Part.* 337; Colwell *v.* Stillman, 1 *Rawle* 212; Lang *v.* Cepley, 1 *Binn.*

[Miller v. Jacobs.]

123; Wilder *v.* Keeler, 3 *Page's Cha. Rep.* 167 ; Earle *v.* Wilson, 17 *Ves.* 527.

*Harris* and *Carothers,* for defendants in error, relied upon the settled doctrine, that if a creditor has two funds from which he may obtain his money, he must so use them that another creditor shall not be prejudiced ; *sic utere tuo ut alienum non lœdas* is a maxim peculiarly applicable to this case. They cited 1 *Johns. Cha. Rep.* 409, 430; Taylor *v.* Maris, MS., Philadelphia, March term 1835 ; 1 *Mad. Cha. Rep.* 203, *new edition* 250; Harrison *v.* Waln, 9 *Serg. & Rawle* 320. On the 16th of August 1830, when Stocker entered his lien in Philadelphia, the property was abundantly sufficient to pay him and Clark both ; and in the face of a notice he did a positive act which deprived Clark of his money, and enabled the debtor to put 5000 dollars into his pocket.

The opinion of the Court was delivered by

GIBSON, C. J.—When Mahon & Duncan executed the mortgage to Clark, on which the plaintiff claims, Stocker stood as a mortgage creditor of the same premises, his mortgage being reinforced by a bond and warrant to confess judgment, not then entered up. Subsequently to Clark's mortgage and bonds, he entered it up in Philadelphia county and acquired a lien there on the real estate of Duncan, one of the mortgagors; after which other creditors of Mahon & Duncan, as well as Duncan's separate creditors, recovered judgments which also bound it. It will be perceived, then, that immediately previous to the vacation of Stocker's judgment, matters stood thus. Clark had a subsequent lien on the mortgage premises in Perry county, and various other creditors had subsequent liens on the estate in Philadelphia, while Stocker had the earliest lien on each. Now if a chancellor would not have compelled him to apply his judgment in Philadelphia, it will follow that Clark had not an interest which could be prejudiced by withdrawing it; and he would have been compellable to apply it but on the foot of an equity in Clark against the other subsequent incumbrancers. A creditor with a right of recourse to two funds, must carve for himself so as to stand as little as possible in the way of those whose recourse is to but one of them ; because he might else cover the residue for the debtor to the prejudice of others having an undoubted right to it. But he is not bound to make room for the admission of one by incommoding another who has equal claims. In that predicament it is at his option to stand still. Between subsequent lien creditors on distinct parts of the general fund, whose equities are balanced, the legal course of execution, therefore, is not to be disturbed ; and a chancellor suffers the general creditor to take satisfaction in the way most conducive to his convenience, or the gratification of his caprice. The rule which gives a separate creditor the exclusive enjoyment of his own peculiar fund, is founded in benevolence, and regulated in

[Miller v. Jacobs.]

its application by the nicest principles of justice; for which reason it will not be enforced to cast the debt on one who is but a surety, or otherwise not bound to bear it.    In Dorr *v.* Shaw, 4 *Johns. Ch. Rep.* 17, Chancellor Kent refused to direct a prior creditor of A and B to raise his debt from the land of A, in favour of a subsequent judgment creditor of B, because it did not appear whether A or B ought ultimately to pay it, or that B had an equity to have it charged on A exclusively.    What equity, then, can Clark claim which the subsequent creditors could not?    They were alike subsequent creditors on separate parts of a general fund, bound by a common lien. It is said his lien bound the estate in Perry county before their liens bound the estate in Philadelphia; and that the maxim *prior in tempore, potior in jure,* gives him a preference.    But what has his lien in Perry county to do with an estate not bound by it?    It is urged that the subsequent lien creditors stand in relation to it exactly as the mortgagors themselves stood; and that Clark, or the plaintiff holding his title, could have had the same recourse to it paramount their liens, that he could have had to it unincumbered in the hands of Duncan the owner, from whom the liens are derived.    But what recourse could he have had to it in his hands, indirectly, by the means of another?    Had Stocker's bond been entered up when Clark took his mortgage, an equity might have grown out of that circumstance, referable, in point of date, to the period of the transaction, and not subject to be disturbed by the introduction of fresh parties.    But it was not entered up, nor did it appear that Stocker intended to enter it; and what recourse could Clark have had to him, before a chancellor, to compel him to enter it?    The estate in Philadelphia would not, but for his own supineness, have been more accessible to any one than to himself.    He might have stipulated for what would have enabled him to pursue it with his own means without invoking the means of another; and if his bond were not so expeditious for want of a warrant to confess judgment on it, that surely would not entitle him to the advantages of one who had made the warrant a condition of his loan.    If Clark had not consented to advance his money on less security, he ought to have done the same. But Mahon and Duncan may have refused to treat on terms so favourable to him; and from his having omitted to insist on conditions more favourable, it is fair to infer that they did refuse.    He ought in that case to have kept his money in his pocket.    How then can he secure to himself better terms than they consented to give, by using, to the disadvantage of the judgment creditors who stand in their place, the bond and warrant of another?    Had Stocker withdrawn his judgment, having for a time kept him at bay with it, he might have had a more specious ground of complaint; but instead of that, Stocker had left the Philadelphia estate uncovered for two years from the date of his own mortgage, and for a year and four months from the date of Clark's.    But had he entered his judgment the next day, still Clark might, by due diligence, have secured the

[Miller v. Jacobs.]

next earliest lien, which would have put him in an attitude as favourable as if the two estates had been originally included in each mortgage, and, in any event, have given him the residue, after satisfaction had by Stocker from either fund, or from both. Neglecting to press his own securities, how could he require Stocker to press his bond and warrant in lieu of them? The annals of equitable administration afford no instance of such a requisition. The nature of the principle supposed to lie at the root of Clark's title to the fund is just this. A creditor who has laid his security on more parcels than are necessary to its satisfaction, may not manage the application of it to keep off subsequent creditors on particular parcels, so as to secure the excess to the debtor, by interposing his lien against them, first on this side, and then on that; and when he attempts it, a chancellor does what? simply uncovers a portion of the property to their demands by shoving the broader security measurably aside in order to let them in, but still reserving enough for its satisfaction. This is the foundation of the relief, and the extent of it. Now had Clark called on Stocker to enter up his bond, he would have called on him to interpose the very obstacle which it is the business of a chancellor to remove; and he certainly could not have procured an equity against the other incumbrancers by procuring an act to his detriment as a pretext for it. In withdrawing his judgment for the benefit of the other creditors, Stocker did nothing which a chancellor would forbid. A creditor taking a security on one of two funds already incumbered, may fairly speculate on the chances of being paid by a proper application of the liens; and he may, therefore, be said to take his security on the credit of both. Here, however, but a single fund was incumbered; and by taking a security on it alone, Clark showed that he was content to repose on it as sufficient for his purpose, at least in connexion with his bonds. As to these he stood in relation to the other property but on a footing with the other creditors. The real estate in Philadelphia was as open to him on them as it was to Stocker or any one else; and he cannot complain that they have distanced him. Having parted with his money on the security of a mortgage and bonds without warrant: he could not complain of having been thrown out, had he even started; nor could he have complained of being refused the use of means to get the lead for which he had not stipulated. He stipulated but for the residue of the mortgage premises; he has had it as far as it could avail him, and he can ask no more.

Judgment reversed, and a *venire facias de novo* awarded.